UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHET MORRISON CONTRACTORS,                          CIVIL ACTION
LLC

VERSUS                                              NO:  14-1958

ONE BEACON AMERICAN                                 SECTION: R(3)
INSURANCE COMPANY, MARKEL
AMERICAN INSURANCE COMPANY;
AND CONTINENTAL INSURANCE
COMPANY

**<u>ORDER AND REASONS</u>**

This is an insurance dispute involving a commercial general liability policy issued to Offshore Marine Contractors, Inc. by defendant Continental Insurance Company. Plaintiff Chet Morrison Contractors, LLC incurred litigation costs and was cast in judgment in an underlying litigation.  Chet Morrison now seeks payment from Continental of costs associated with defending the underlying suit, as well as the amount of the judgment against it.  Both parties have filed cross motions for summary judgment.  For the following reasons, the Court GRANTS Continental's motion for summary judgment and DENIES Chet Morrison's motion for summary judgment.


I.      **BACKGROUND**

        A.      **The Underlying "Offshore Marine" Litigation**

        On October 29, 2010, Offshore Marine Contractors, Inc. filed suit, alleging that Palm Energy Offshore, LLC and Chet Morrison Well Services, LLC failed to pay for the charter of one of Offshore Marine's vessels, the L/B NICOLE EYMARD.  Offshore Marine also claimed that Palm Energy and Chet Morrison breached a separate oral contract that the

parties allegedly formed after the L/B NICOLE EYMARD's legs became stuck in the seabed. Under the terms of the alleged oral contract, Palm Energy and Chet Morrison promised to pay Offshore Marine for repair costs and lost charter fees if Offshore Marine freed the vessel by cutting its legs.[1]

Chet Morrison later sued Palm Energy and H.C. Resources, LLC ("HCR") alleging that if Chet Morrison were found to have chartered the L/B NICOLE EYMARD, Palm Energy and HCR were obligated to pay Chet Morrison the cost of the charter, plus a 15% markup and interest for untimely payments.  On February 6, 2013, the Court consolidated the two cases for trial.[2]

On June 24, 2013, the Court conducted a two-day bench trial and summarized its findings as follows:

> (1) [Chet Morrison] is liable to [Offshore Marine] for the charter of the L/B NICOLE EYMARD for the Chandeleur 37 job, which took place from July 15 to July 27, 2008.  HCR is in turn liable to [Chet Morrison] for the full amount of those charter fees.

> (2) [Chet Morrison] is liable to [Offshore Marine] for the charter of the vessel for the West Delta 55 job, which took place from July 28 to August 18, 2008.  [Palm Energy] is in turn liable to [Chet Morrison] for the full amount of those charter fees.

> (3) Neither [Chet Morrison] nor [Palm Energy] is liable for the repair costs and downtime charter associated with the decision to cut the leg of the vessel.[3]

---

[1]  *Offshore Marine Contractors, Inc. v. Palm Energy Offshore LLC and Chet Morrison Well Services, LLC*, No. 10-4151, R. Doc. 1. (hereinafter "Offshore Marine Litigation").

[2]  Offshore Marine Litigation, R. Doc. 140.

[3]  Offshore Marine Litigation, R. Doc. 243.  The Court later amended the judgment limiting Chet Morrison's liability for the West Delta 55 job to charter fees

In addition to the judgment against it, Chet Morrison incurred attorneys' fees and costs in defense of the Offshore Marine Litigation.[4]

Here, neither Chet Morrison nor Continental dispute: (1) that Chet Morrison tendered its defense and requested coverage from Continental; (2) that Continental has had sufficient time and information to make defense and coverage decisions; and (3) that Continental denied Chet Morrison's request for defense and indemnification.[5]

### B.    The Instant Litigation

After the Court's bench trial in the Offshore Marine Litigation, Chet Morrison sued defendants Onebeacon America Insurance Company, Markel American Insurance Company, and Continental Insurance Company alleging that all three insurance companies failed to undertake Chet Morrison's defense in the Offshore Marine Litigation despite Chet Morrison's status as an "additional insured" under the insurance policies underwritten by the defendants.  Thus, Chet Morrison seeks to recover the amount it was cast in judgment, as well as defense costs associated with the Offshore Marine Litigation.  Chet Morrison also asserts derivative statutory bad faith claims relating to the denial of those defense costs.

On October 14, 2014, defendants Onebeacon and Markel moved the Court to dismiss the claims against them for failure to state a claim.[6]  The Court concluded that the only

---

incurred between July 28 and July 31, 2008.  Offshore Marine Litigation, R. Doc. 258 at 15.

[4] *See* R. Doc. 30-1, at 2, ¶9 (Chet Morrison's statement of uncontested facts); R. Doc. 40-1, at 2, ¶9 (Continental's admission).

[5] *See* R. Doc. 30-1, at 2, ¶11-13 (Chet Morrison's statement of uncontested facts); R. Doc. 40-1, at 2, ¶11-13 (Continental's admissions).

[6] R. Doc. 18.

policy underwritten by the moving defendants provided no defense coverage to Chet Morrison.  Accordingly, the Court granted the motion and dismissed Chet Morrison's claims against Onebeacon and Markel.[7]  Chet Morrison's claims against defendant Continental are the only claims remaining in this litigation.

### C.      Continental's Commercial General Liability Policy

At issue in this case is a Marine Services Liability Policy, ML 0871842 (the "Policy"), which Continental issued to Offshore Marine as the named insured.[8]  The Policy does not specifically identify Chet Morrison as an additional insured.  Instead, the Policy contains a blanket additional insured endorsement, which provides:

> WHO IS AN INSURED (Section II) is amended to include any person or organization as an insured under this policy to the extent you are obligated by an "insured contract" to include them as Additional Insureds, but only with respect to "your work."[9]

Under the terms of the endorsement, the prerequisite to additional insured coverage is an "insured contract" between Offshore Marine and Chet Morrison.  In relevant part, the Policy defines "insured contract" as:

> That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.[10]

---

[7] R. Doc. 28.

[8] R. Doc. 29-4.

[9] *Id.* at 31.

[10] *Id.* at 10.

4

Under the Policy, Continental agreed to cover all claims involving liability incurred because of "bodily injury" or "property damage":

> We will pay those sums, in excess of the deductible, that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.[11]

The Policy limits coverage to instances in which "[t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.' "  Thus, one trigger for coverage under the Policy is the existence of a claim for "property damage."  The Policy defines that term as follows:

> a. Physical injury to or destruction of tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b. Loss of use of tangible property that is not physically injured or destroyed.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.[12]

In addition, the Policy contains an exclusion stating coverage does not apply to: " '[p]roperty damage to . . . property you own, rent, or occupy."[13]  Under the Policy, the term "you" refers to the Policy's named insured.[14]

---

[11] *Id.* at 17.

[12] *Id.* at 10.

[13] *Id.* at 19.

[14] *Id.* at 17 ("Throughout this Coverage Form the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.").

### D.      The Cross Motions for Summary Judgment

Chet Morrison and Continental now move for summary judgment.  Chet Morrison argues that it is covered as an additional insured under the Policy because Offshore Marine agreed to indemnify and hold Chet Morrison harmless under no less than five "insured contracts."  Chet Morrison further argues that the allegations in the Offshore Marine Litigation triggered Continental's duty to defend Chet Morrison and indemnify it against any loss.  Specifically, Chet Morrison points to Offshore Marine's allegations that the L/B NICOLE EYMARD became stuck in the seabed and that the vessel sustained severe damage when Chet Morrison cut its legs to set it free.  According to Chet Morrison, these allegations demonstrate that Chet Morrison faced the possibility of becoming obligated to pay damages "because of property damage."  Thus, Chet Morrison concludes that Continental must pay for defense costs incurred and losses that Chet Morrison sustained in the underlying litigation.

Continental assumes for the purpose of its motion for summary judgment that Chet Morrison was an additional insured under the Policy.  Thus, Continental states that "the duty to defend would exist unless the claims asserted by [Offshore Marine] are unambiguously excluded" from coverage.[15]  Nonetheless, Continental contends that it had no duty to defend Chet Morrison in the Offshore Marine Litigation because coverage was foreclosed by several policy exclusions.

---

[15] R. Doc. 29-1 at 2. ("Although CIC disputes CMS'c claim that CMWS was an additional insured under the policy, for purposes of the present motion only, CIC will assume that CMC and CMWS were additional insureds under Poilcy ML0871842.").

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).  The Court must draw reasonable inferences in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 2738 (2d ed. 1983)).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991).  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."  *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving

7

party's claim.  *See Celotex*, 477 U.S. at 325.  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.  *See id.* at 324.

The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial.  *Id.*; *see also Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting *Celotex*, 477 U.S. at 322).


## III.   DISCUSSION

An insurer's duty to defend an insured is "a separate and distinct inquiry from that of the insurer's duty to indemnify a covered claim after judgment against the insured in the underlying liability case." *Marco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 872 (5th Cir. 2009) (citing *Elliot v. Cont'l Cas. Co.*, 949 So. 2d 1247, 1250 (La. 2007)).  The Court, therefore, will address each duty separately.

### A.      Duty to Defend

An insurer's duty to defend suits against its insured is broader than its obligation to indemnify for damage claims.  *Hardy v. Hartford Ins. Co.*, 236 F.3d 287, 290 (5th Cir. 2001); *Suire v. Lafayette City-Parish Consol. Gov't*, 907 So. 2d 37, 52 (La. 2005); *Yount v. Maisano*, 627 So. 2d 148, 153 (La. 1993).  Under Louisiana law, courts determining an insurer's duty to defend follow the "Eight Corners" rule:  if, after comparing the terms of the policy to the allegations of the complaint, the court determines that "'there are any facts

in the complaint which, if taken as true, support a claim for which coverage is not unambiguously excluded,' the insurer must defend the insured." *Lamar Advert. v. Cont'l Cas. Co.*, 396 F.3d 654, 660 (5th Cir. 2005); *see also Holzenthal v. Sewerage & Water Bd. of New Orleans*, 950 So.2d 55, 84 (La. App. Cir. 2007) ("An insurer must provide a defense to an insured if, assuming all of the allegations to be true, there would be both coverage under the policy and liability to the plaintiff.") (citing *Am. Home Assur. Co. v. Czarniecki*, 230 So. 2d 253 (La. 1969)).   "The allegations . . . must be liberally interpreted in determining whether the claim falls within the scope of the insurer's duty to defend." *Hardy*, 236 F.3d at 290 (5th Cir. 2001) (citing *Yount*, 627 So.2d at 153).   But, while the court must accept as true the facts alleged in the complaint for purposes of applying the Eight Corners rule, the court need not credit "statements of conclusions . . . that are unsupported by factual allegations." *Coleman v. Sch. Bd. of Richland Parish*, 418 F.3d 511, 523 (5th Cir. 2005) (quoting *Jensen v. Snellings*, 841 F.2d 600, 612 (5th Cir. 1988)); *accord* William S. McKenzie & H. Alston Johnson, III, 15 Louisiana Civil Law Treatise, Insurance Law & Practice § 7:2 (4th ed. 2012) ("It is well settled that the allegations of fact, and not conclusions, contained in the petition determine the obligation to defend.").   "[O]nce a complaint states one claim within the policy's coverage, the insurer has a duty to accept defense of the entire lawsuit, even though other claims in the complaint fall outside of the policy's coverage." *Coleman*, 418 F.3d at 523 (quoting *Montgomery Elevator Co. v. Bldg. Eng'g Servs. Co.*, 730 F.2d 377, 382 (5th Cir. 1984)); *accord* McKenzie & Johnson, *supra*, § 7:2.

Here, the relevant pleadings for determining Continental's duty to defend are Offshore Marine's complaint and Palm Energy's cross-claim against Chet Morison in the

Offshore Marine Litigation.  Ordinarily, the Court would undertake this analysis in two steps: first, the Court would determine whether either "complaint allege[d] a set of facts that would fall within coverage"; second, the Court would determine whether Continental carries its burden of proving any policy exclusion applies.  *See Martco*, 588 F.3d at 874.  Here, however, the Court finds that Continental easily meets its burden of proving that coverage under the Policy is foreclosed by a policy exclusion.  This single issue is dispositive of all other aspects of Continental's duty to provide a defense.  Thus, the Court assumes for purposes of this order that the claims against Chet Morrison alleged facts that would fall within coverage and proceeds directly to the issue of whether an exclusion applies.

The Policy that Continental issued to Offshore Marine covers only "'bodily injury' or 'property damage' [that] is caused by an 'occurrence' that takes place in the 'coverage territory.'"[16]  The Policy defines "property damage" as:

> a. Physical injury to or destruction of tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured or destroyed. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

In short, Continental's Policy is triggered only by claims for either bodily injury or either physical injury to or loss of use of tangible property.

Certain property damage claims are, however, excluded from coverage under the Policy.  Exclusion j(1) of the Policy states that the Policy does not apply to "

---

[16] R. Doc. 29-4 at 17.

'[p]roperty damage' to . . . [p]roperty you own, rent, or occupy."[17]  The Policy

defines "you" as the named insured.[18]  Although "named insured" is not further

defined in the contract, the term's meaning is abundantly clear: the Policy's

declarations page lists Offshore Marine Contractors as the only named insured

on the Policy.  Exclusion j(1) therefore precludes coverage for property damage

to property owned, rented, or occupied by the named insured, Offshore

Marine.  The parties do not dispute that Offshore Marine owns the L/B

NICOLE EYMARD.  Moreover, a review of the pleadings in the underlying

litigation shows that the only allegations against Chet Morrison that arguably

triggered Policy coverage involved damage to the L/B NICOLE EYMARD.

According to Offshore Marine's complaint, Chet Morrison chartered

Offshore Marine's vessel, the L/B NICOLE EYMARD in order to complete a

job for Palm Energy at West Delta 54.[19]  According to the complaint, the L/B

NICOLE EYMARD arrived at West Delta 54 and jacked without incident.[20]

But when the vessel began to jack down, the crew realized that its legs were

---

[17] *Id.* at 1.

[18] *Id.* at 17 ("Throughout this Coverage Form the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.").

[19] Offshore Marine Litigation, R. Doc. 1 at 8, ¶29.

[20] *Id.* at 9, ¶31.

stuck in the seabed.[21]  This effectively immobilized the vessel at West Delta 54 and prevented Chet Morrison from taking it off charter.[22]   The complaint alleges that despite receiving invoices from Offshore Marine, Chet Morrison and Palm Energy both refused to make payments due under the charter agreement.[23]  The complaint further alleges that L/B NICOLE EYMARD was not freed from the seabed until Offshore Marine, Chet Morrison, and Palm Energy reached an unusual agreement.  With Hurricane Fay approaching, threatening damage to the immobilized vessel, all parties allegedly agreed as follows:

> Offshore Marine [would] allow the legs on the vessel Nicole to be cut so that the vessel could be moved off location from West Delta 54.  In exchange for Offshore Marine allowing the legs to be cut and thereby insuring that no further damage (this time from Hurricane Fay) would be sustained, Palm Energy and Chet Morrison agreed to pay for repairs to the legs and further to agree that the vessel would remain "on charter" until she was ready again to put to sea.[24]

According to the complaint, Offshore Marine allowed the legs to be cut and completed repairs on the vessel, but Chet Morrison and Palm Energy refused

---

[21] *Id.* at 9, ¶32.

[22] *Id.*

[23] *Id.* at 11, ¶38.

[24] *Id.* at 10, ¶35.

to reimburse Offshore Marine for costs incurred.[25]  Thus, Offshore Marine's complaint sought damages for defendants' alleged breaches of both the charter and the contract to cut-and-repair the L/B NICOLE EYMARD.[26]

To the extent that Offshore Marine's complaint alleged liability "because of property damage," all of the relevant damage was to Offshore Marine's own vessel.  Specifically, the L/B NICOLE EYMARD became stuck in the seabed at West Delta 54, and the L/B NICOLE EYMARD sustained damage when Chet Morrison cut its legs to set it free.  As noted earlier, exclusion j(1) excludes from coverage damage to "property [Offshore Marine] own[s], rent[s], or occup[ies]."  Therefore, exclusion j(1) precludes coverage for claims fo property damage to the L/B NICOLE EYMARD.

Chet Morrison makes two arguments against this conclusion.  First, Chet Morrison argues that the Policy's *In Rem* Endorsement trumps exclusion j(1) and extends coverage to liabilities sustained because of the operation of Offshore Marine's vessels.  The *In Rem* Endorsement states, in its entirety, as follows: "We agree that any action '*In Rem*' against any vessel owned, operated

_____

[25] *Id.* at 11, ¶39.

[26] In addition, Palm Energy asserted a cross-claim against Chet Morrison. (Offshore Marine Litigation, R. Doc. 26).  In applicable part, Palm Energy alleged as follows: "In its Complaint (Document 1), OMC claims that its vessel suffered severe damage while conducting (or when completing) the P&A Activities and has asserted claims against Palm and Chet Morrison relating thereto."  Palm Energy sought defense and  indemnity from Chet Morrison for Offshore Marine's claims against Palm Energy.

by or for, or chartered by or for you shall in all respects be treated in the same manner as though the action were '*In Personam*' against you."[27]   This is a narrow provision with a specific purpose.   Under its plain terms, if one of Offshore Marine's vessels is sued *in rem*, Continental's Policy will cover that suit as if it had been made against Offshore Marine itself.   *See Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 420 (4th Cir. 2004) (concluding that an *In Rem* Endorsement "requires that in rem actions against watercraft are to be treated as in personam actions against insureds").   Thus, the endorsement has no effect unless a plaintiff makes an *in rem* claim against a vessel.   Here, Offshore Marine sued Chet Morrison and Palm Energy; it made no claim against the L/B NICOLE EYMARD.   Thus, Chet Morrison's argument fails.

Second, Chet Morrison argues that exclusion j(1) simply does not apply to additional insureds.   Chet Morrison asserts that because the exclusion uses "you," meaning the named insured, to identify the property damage excluded, that exclusion applies only to Offshore Marine.   According to Chet Morrison, exclusion j(1) therefore cannot prevent additional insureds like Chet Morrison from benefitting from coverage under the Policy.   This argument is also

---

[27] R. Doc. 29-4 at 37.

without merit.  While exclusion j(1) does use the term "you," it uses that term only to identify the property to which the exclusion applies.  Specifically, exclusion j(1) states that the Policy does not apply to damage to "[p]roperty you own, rent, or occupy."  The exclusion does not in any way limit who is subject to the exclusion.  *Cf. Deville v. Conmaco/Rector, L.P.*, No. CIV.A. 09-7391, 2010 WL 3924067, at *4 (E.D. La. Sept. 28, 2010) *aff'd*, 516 F. App'x 296 (5th Cir. 2012) (concluding that exclusion could reasonably be read to apply only to named insured when exclusion used "you" to indicate to whom it applied).  Rather, the exclusion precludes coverage for any damage sustained to Offshore Marine's property, regardless of whether coverage is sought by Offshore Marine, Chet Morrison, or anyone else who might otherwise qualify for Policy coverage.

Again, the Policy at issue covered only "sums . . . that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.' "[28]  As discussed above, the only allegations in the Offshore marine that involved bodily injury or property damage were (1) that the L/B NICOLE EYMARD became stuck in the seabed and (2) that its legs were cut to allow it to break free.  Both allegations involve damage to the L/B NICOLE

---

[28] *Id.* at 17.

15

EYMARD, a vessel owned by the named insured, Offshore Marine.  Thus, both allegations fall squarely within exclusion j(1).  Accordingly, the Court finds that even if the claims against Chet Morrison in the Offshore Marine Litigation fell within the Policy's ambit, the exclusion would nonetheless operate to preclude coverage.  Continental has demonstrated that it had no duty to defend Chet Morrison, and the Court grants Continental's motion for summary judgement.

### B.    Duty to Indemnify

As discussed above, an insurer's duty to defend suits is broader than its obligation to indemnify for damage claims.  *Suire*, 907 So. 2d at 52.  Thus, while the duty to defend applies "whenever the pleadings against the insured disclose even a possibility of liability," *Sibley v. Deer Valley Homebuilders, Inc.*, 32 So. 3d 1034, 1039 (La. App. 2 Cir. 2010), the duty to indemnify arises only when the insured is found liable for a loss that is covered by the policy. *Chi. Prop. Interests, LLC v. Broussard*, 8 So. 3d 42, 48 (La. App. 5 Cir. 2009). Here, the Court finds that Continental had no duty to defend Chet Morrison because there was no possibility of liability under the Policy.  This finding is conclusive on the indemnification issue as well.  Because  the Policy excluded claims for damage to the L/B NICOLE EYMARD, Continental has no duty to make payment for liabilities incurred by Chet Morrison in the Offshore Marine Litigation.  Thus, the Court denies Chet Morrison's motion for summary

judgment and grants Continental's motion for summary judgment on indemnification.

### C.     Statutory Bad Faith Claims

In addition to its claims for remuneration, Chet Morrison also asserts derivative statutory bad faith claims under La. R.S. §§ 22:1892 and 22:1973. Because the Court finds that Continental had no duty to defend Chet Morrison in the underlying litigation, Chet Morrison's argument that Continental acted in bad faith by refusing to reimburse Chet Morrison's defense costs necessarily fails. *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc.*, 57 F. Supp. 3d 728, 763 (E.D. La. 2014) *aff'd*, 593 F. App'x 408 (5th Cir. 2015) *aff'd sub nom. XL Spec. Ins. Co. v. Bollinger Shipyards, Inc.*, No. 14-31283, 2015 WL 5052504 (5th Cir. Aug. 27, 2015).   Continental is not liable for statutory penalties, attorneys' fees, costs, or interest.

# IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Chet Morrison's motion for summary judgment and GRANTS Continental's motion for summary judgment.

New Orleans, Louisiana, this 18th day of September, 2015.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

18